C. A. MIRACLE and C. A. MIRACLE, JR., Co-Partners, trading and doing business as Mac's Bar & Liquor Store, and Mac's Liquor Store & Bar, v. HERBERT M. KRIENS.

33 So. (2nd) 644
January 16, 1948
Rehearing denied February 16, 1948

January Term, 1948
En Banc

*Evan T. Evans* and *P. Guy Crews,* for appellants.
*John T. Teate,* for appellee.

SEBRING, J.:

C. A. Miracle and C. A. Miracle, Jr., as copartners, were the owners of a combination cocktail lounge and barroom known as Mac's Bar & Liquor Store, operated for the entertainment and pleasure of white patrons only. They had in their employ one Dorsey, who is admitted by the pleadings to have been acting within the scope of his employment in regard to the matters hereinafter narrated. The barroom was separated from the cocktail lounge by a partition wall running through the center of the building from front to back, and partition

openings at front and rear led from one side of the establish-
ment to the other. Along the partition wall on the cocktail
lounge side, booths were built for the use of patrons. A front
door opened from the cocktail lounge into the public street.
On the barroom side, doors opened into the front street and
into the alley or areaway at the rear of the building.

One Saturday evening while the appellee, Herbert M.
Kriens, and a female companion whom he afterwards married
and whom we shall refer to as Mrs. Kriens, were seated in a
booth in a cocktail lounge drinking beer, the employee, Dorsey,
was shot by a former negro employee then on the premises.
The bullet fired by the negro passed through the body of
Dorsey and struck Kriens, inflicting serious injuries. There-
upon Kriens sued the two Miracles and the jury gave him a
verdict for damages. A motion for new trial was denied and
judgment was entered. The defendants below have taken an
appeal from the judgment and question the sufficiency of the
evidence to sustain recovery.

The plaintiff below attempts to defend his judgment for
damages entered against the defendants upon the theory that
the proximate cause of his injury was an unlawful and feloni-
ous assault committed by the employee, Dorsey, upon a peace-
able negro then lawfully upon the premises of the defendants,
thereby provoking the negro, in the necessary and justifiable
defense of his person, into shooting the employee with a
pistol he was carrying concealed upon his person, with the
result that the bullet passing through the body of the em-
ployee struck the plaintiff and inflicted injuries.

Whatever may be the legal soundness of the plaintiff's
theory—a matter which in our opinion need not be decided
upon this appeal—the evidence does not support it. The plain-
tiff's version of what transpired while he and his companion
were seated in the booth is most completely narrated by Mrs.
Kriens, the only eye-witness to the event produced by the
plaintiff, who testified on behalf of her husband as follows:
"Well, I was facing the street in the booth . . . I was looking
out in the street when I saw Dorsey and this fellow through
the left door just behind the booth into this annex part, and
they were arguing, and they took a few steps toward the door,

and the colored man was backing up and Dorsey was walking toward him, and just when I saw them arguing, then, they made about three or four steps and then I saw Dorsey start to strike the colored man on the head with something; I do not know, it looked to me like a club. He struck him the first lick, and then I saw the gun and then I saw it fire and that is about all there was to it, and the colored man rushed out the door . . . I would say [that Dorsey hit the negro] three or four times . . . I said to my husband 'Oh, he shot that man,' and at that instant I looked at my husband and he had a blank look on his face, and had turned back around then and ducked down under the table, and of course, then, I realized that he had been hit too . . . "

The plaintiff Kriens could add nothing of particular moment to the testimony given by his wife. His material statements on the issue were: "Well, there was a commotion, which was in back of me, and I turned around in my seat. I saw Dorsey, the bartender, in the act of striking this other person, and that is about the last I know, because about that time I got the bullet in my head . . . The fight actually started—the argument started in the barroom and the actual fight happened in the annex." The plaintiff testified, further, on cross-examination, that he did not know what caused the argument between Dorsey and the negro, what had occurred between them previous to the argument, or who was the initial aggressor in the ensuing encounter.

Upon this testimony the trial judge denied a motion for instructed verdict which contained the ground that the evidence failed to show the liability of the defendants for the injury sustained; and the defendants thereupon offered evidence in support of their version of the transaction.

This evidence was given by the employee Dorsey, who testified that the negro who fired the shot had formerly been employed in the place but had been dismissed by Dorsey on Wednesday prior to the shooting. At the time of his dismissal the negro had become angry and had told Dorsey in a threatening tone that "he would come back." On the following Saturday night Dorsey had seen the negro come into the barroom from the rear door of the building. Dorsey immediately

approached the negro and told him to leave the premises. The negro made some statement to Dorsey in an impertinent tone, the exact words used not being clearly heard by Dorsey; and then instead of leaving the place turned and walked through the partition doorway into the cocktail lounge, where Mr. and Mrs. Kriens and other customers were sitting. As the negro went into the cocktail lounge he was wearing a hat and puffing on a cigar.

The material features of the remainder of Dorsey's testimony are quoted from the record, as follows: "When he refused to go out the way I told him to, he went in the cocktail lounge where he wasn't supposed to be . . . and I picked up a billy and went around the other way and went in the cocktail lounge. He was standing in the middle of the floor right where everybody was sitting around in the booths, and I told the negro there and then I had asked him out, that I didn't want him in there, and he said something smart and . . . he acted like he reached for his pocket and I didn't know what he was after, and the first thought I had was to put the negro out as quick as I could and get out of the way, because I didn't know what he was up to. So I hit him with the billy, and about the second time . . . he outs with a 25 and shoots me before I could get my hands on it . . . It knocked me about halfway around, and I finished the circle and went back toward him and . . . he turned and ran out the door . . . [The negro] never flashed [the gun] until he went for his pocket, and I thought that was what he was after. After he had been smart, I thought he was up to something . . . I walked up to him. I seen him standing there and I told him I had told him to get out, and he made some smart remark, and said that he would get out when he got ready to, and I said he would get out now, and he reached for his pocket and that is when I hit him."

The statement made by Dorsey to the effect that the entire affair beginning with the verbal argument and ending with the exchange of blows took place in the cocktail lounge, and did not begin in the barroom, as contended by the plaintiff, finds some substantiation in the testimony of one of the defendants who was tending bar at the time of the occurrence.

He testified: "I didn't even see the negro at the start; the first thing I knew, I saw Dorsey walk around the front of the bar and pick up this blackjack from under the counter *and go to the other side,* and I kept on serving them, figuring he could take care of the situation . . . and the next thing I knew . . . ·Dorsey *came back in there* holding his side, and I said 'What is the matter,' and he said, 'I am shot,' and about that time Mr. Kriens *came in behind him* and he fell to the floor . . . "

If only the evidence adduced by the plaintiff is accepted as credible, the plaintiff has failed to prove his case; for all that he has shown is the fact of an encounter between an employee of the defendants and a negro then and there in an establishment catering to white patrons only, during the course of which he, the plaintiff, was injured by a stray bullet fired from a gun which the negro had had secretly concealed upon his person. The fact that such an encounter occurred, even though the employee was seen to strike the first blow, does not in and of itself prove that the employee "unlawfully assault the negro who was then lawfully on the premises"—as is maintained by the plaintiff in the theory of his case.

On the other hand if the evidence offered on behalf of the defendant is entitled to credence, a much greater reason is shown for denying recovery. Although the proprietor of a liquor saloon or other place where intoxicants are sold is not an insurer of the safety of his patrons, as against outsiders, other patrons, or even his own servants, he certainly is bound to use every reasonable effort to maintain order and discipline among his patrons, his servants, or those who, while not necessarily in search of drink or pleasure, come upon the premises and are likely to produce discords or disorders to the injury or inconvenience of patrons lawfully in his place of business.

It seems reasonably clear from the evidence that the former negro employee did not come into the defendants' place of business for the purpose of drinking with the patrons. Indeed, had such been his purpose he would certainly have come forewarned that he would not be welcome there; for it was known to him that the place run by the defendants catered to white patrons only. The fact that the negro came in the

rear door, not the front door, was carrying a concealed weapon, and truculently refused to leave the premises when requested by Dorsey, clearly points to the fact that in all likelihood he was there to make trouble, or at least to cause embarrassment to the defendants; and in all probability anticipated and invited forcible ejection so that he might have what doubtless seemed to him lawful grounds to use his weapon. The fact that he did use his gun at the very threshhold of efforts to eject him after he had refused to leave lends considerable support to the supposition that such must have been his purpose.

When all of these facts are considered it appears to us that Dorsey's actions were entirely commensurate with the degree of care which the defendants owed to their patrons lawfully on the premises. It seems apparent that Dorsey took every precaution that it was possible for a reasonable person to take in a similar situation. Under the circumstances as they then were presented, it would have been impracticable for the police to have been called to eject the former employee, for the uncontradicted evidence is that the negro reached for his gun the moment Dorsey approached him for the purpose of telling him the second time to leave the premises.

The plaintiff below having failed to prove his case by a preponderance of the evidence, the judgment appealed from should be reversed.

It is so ordered.

THOMAS, C. J., TERRELL and ADAMS, JJ., concur.

BUFORD, CHAPMAN and BARNS, JJ., dissent.

BUFORD, J., dissenting:

I think the question of weight and credibility of evidence was for jury. I think Mrs. Kriens testimony made a case for recovery.

BARNS, J., concurs.